C4UFCONA

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SERE CONDE,

4                   Plaintiff,

5          v.                              11 CV 4010 (RJS)

6   SISLEY COSMETICS, USA, INC.
    and SAKS INCORPORATED,
7
                    Defendant.
8
    ------------------------------x
9                                          New York, N.Y.
                                           April 30, 2012
10                                         2:30 p.m.

11  Before:

12                  HON. RICHARD J. SULLIVAN,

13                                         District Judge

14                          APPEARANCES

15  THE WHITE ROSE GROUP LLC
         Attorneys for Plaintiff
16  JESSE CURTIS ROSE, ESQ.

17  WILLIAM KERRY PHILLIPS, ESQ.
         Attorney for Plaintiff
18
    SCHNAUFER & METIS, LLP
19       Attorneys for Defendant Sisley Cosmetics USA
    PETER METIS, ESQ.
20
    THOMPSON WIGDOR & GILLY LLP
21       Attorneys for Defendant Saks Incorporated
    LAWRENCE MICHAEL PEARSON, ESQ.
22  TANVIR RAHMAN, ESQ.

23

24

25
```

C4UFCONA

```
 1          (Case called)

 2          (In open court)

 3          THE COURT:  We're here on the argument on Saks' motion

 4   to dismiss.  I have reviewed the papers and I've taken a look

 5   at the complaint, obviously.  So it's your motion.  You're

 6   going to cover this, Mr. Pearson?

 7          MR. PEARSON:  Yes, your Honor.

 8          THE COURT:  So we'll start with you and then we'll

 9   hear from the plaintiffs.  Who is going to carry the ball for

10   the plaintiffs?  Mr. Rose?

11          MR. ROSE:  Yes, sir.

12          THE COURT:  Then I'll let you get a word in after

13   that, okay?

14          MR. PEARSON:  Thank you, your Honor.

15          May it please the Court.  As your Honor just said, you

16   already have the motion papers, you've gone over them, so I'm

17   not going to rehash these arguments in their entirety, but I

18   did want to focus on a few core points here to essentially

19   bring some highlights to the Court's attention.  The three

20   major grounds for the motion to dismiss are that all that

21   plaintiff has alleged here, even in her amended complaint, is a

22   routine vendor relationship, and the general sort of contact

23   and proximity that any vendor has with the employees of the

24   facility or client that they're serving or working with or next

25   to.  The allegations are inadequate, even taken as true, to the
```

C4UFCONA

```
 1    extent that they are factual in nature, to establish an
 2    employment relationship under any cognizable theory.  There's
 3    just no allegation of immediate control here in any sphere of
 4    this purported employment relationship.
 5             The second main driver here is that there's no
 6    allegation of unlawful conduct by Saks and we'll go into that
 7    in detail.  There's no allegation of discriminatory conduct,
 8    awareness of protected activity or retaliatory action and no
 9    allegations that would even approach the constructive discharge
10    standard even if all the allegations are taken as true.  And
11    finally, there are grounds for dismissing Title VII and New
12    York City Human Rights Law claims on jurisdictional grounds,
13    because the administrative filing requirements were not
14    satisfied for those claims.
15             Now, plaintiff will likely rest on a lenient motion to
16    dismiss pleading standard.  But I would say that even under the
17    pre Twombly and Iqbal standards these allegations would be
18    inadequate, much less since those cases.  The complaint is
19    basically riddled with issues and any of these grounds would be
20    sufficient to have the complaint dismissed.
21             Now, I know that the Court is familiar with the
22    complaint.  However, I'd like to highlight some of the case
23    facts for the Court before we dive into the legal arguments.
24             THE COURT:  Case facts beyond what's in the complaint,
25    you mean?
```

C4UFCONA

1          MR. PEARSON:  No, no, no, your Honor, but I do believe

2     there are certain allegations that are most on point here, that

3     are most relevant to the motion to dismiss argument.

4          As the Court knows, the plaintiff filed both the

5     complaint and amended complaint here following the premotion

6     letter by Saks.  Even in the amended complaint plaintiff makes

7     it clear that she began working for Sisley back in

8     September 2007.  She was paid by Sisley, Sisley determined her

9     rate of pay and she was supervised by Sisley employee Bhagvan

10    Dugre.  She identifies herself as one of Sisley's top sales

11    employees and she alleges at the very beginning of her

12    complaint, paragraph 2, that she observed Sisley discriminated

13    against Arab customers, not Saks, your Honor.  She also alleges

14    various comments by her supervisor Dugre, including one in

15    which Dugre reported that Sisley wanted more blonde girls,

16    again, not Saks.

17         In December of 2000 Conde decided to speak out about

18    this allegedly discriminatory behavior against Arab customers.

19    Who did she go to?  She went to Sisley's accountant, who is not

20    alleged to be an employer of any kind in any capacity.  Then on

21    August 22, 2010 she was accused by Conde -- I'm sorry, Conde

22    was accused by Dugre of insulting a customer and Dugre told her

23    to go home.  Almost a week later Conde received a phone call

24    from Sisley's HR director, or so it's alleged, who told Conde

25    that she was going to be reassigned to Bloomingdale's and she

C4UFCONA

1  was going to be put on final warning.  Again, no contact

2  whatsoever with Saks employees here.

3          And, finally, when plaintiff resigned, she resigned

4  from Sisley.  She called Sisley's HR director and said I am

5  resigning my employment.  Again, no contact with Saks

6  whatsoever.  Now, plaintiff will and has argued that Saks had a

7  hand in her removal from its store, right?  Saks said, look, we

8  don't want Conde working in our store any more as a vendor for

9  Sisley, and that that serves somehow as the basis for finding

10 that Saks engaged in some kind of adverse action against Conde.

11 However, in the Gonzalez v. Allied Burton case which was issued

12 in September 2010, and that was, by the way, a report and

13 recommendation from Judge Ellis to the Court, to your Honor, it

14 was found, albeit on a summary judgment basis but it was found

15 that as a matter of law a company's request that a certain

16 vendor's employee no longer work at their facility is not a

17 basis for joint employment.

18          So under the relevant legal tests here, joint

19 employment is one of them, how do these allegations stack up?

20 Plaintiff in spite of all of this, right, in spite of all these

21 allegations that relate only to Sisley, is trying to drag Saks

22 into this case even though there's nothing to show in the

23 complaint that this was anything other than a completely

24 routine vendor relationship.

25          She doesn't allege that Saks was her primary employer.

C4UFCONA

1    Instead, somehow she's asserting that Saks was an employer due

2    only to some vague notion that it controlled her employment,

3    that's in paragraph 15, just conclusory asserts that because

4    Saks controlled her employment that Saks belongs in this case,

5    somehow liability can be imputed to Saks.

6           So what are the relevant theories here?  First of all,

7    under a single employer theory a company can only be found to

8    be an employer to the extent that it's not identified as a

9    primary employer under extraordinary circumstances.  So

10   circumstances that would show substantial, significant overlap

11   in things like operations, labor relations.  Here we're dealing

12   with separate corporate entities, and that's not disputed by

13   the plaintiff.  So that test completely, it completely fails

14   that test.  Under the joint employer test the Court could

15   examine whether or not the complaint puts forth enough factual

16   allegations to establish either joint administration of hiring,

17   firing, discipline, pay, insurance, core benefits, records, all

18   these different hallmarks of employment and there's just

19   nothing in the complaint to show joint administration here.

20   There are no allegations of common policies, there's no

21   allegation of immediate control, direct control of Conde by

22   Saks, and this is just borne out by the various allegations

23   that we just discussed.

24          This isn't a subcontractor relationship.  Conde wasn't

25   working at Saks' direction to accomplish things that Saks was

trying to do in the course of its operations.  There's no
allegation that this was anything other than a discrete part of
the store and that Sisley was just another vendor operating
alongside the various other vendors that you find in a large
commercial operation or store like Saks.

Now, plaintiff tries to get by by saying in paragraph
19 that upon information and belief Saks could deny her
employment.  But this is a conclusory allegation.  It's just
simply not entitled to any presumption of truth because it's
not factual in any way.  Plaintiff concedes at page 3 of its
opposition that she was only terminated in the sense that, by
Saks, at least, in the sense that she was assigned to a
different store, but Saks didn't assign her to that other
store, and Saks isn't responsible for the quality of her
assignments.  There's no allegation that Saks controlled her
assignments.  There's only the allegation, as we just discussed
with the Gonzalez case, that they requested that a certain
vendor employee not work at their store.

There's another case cited in the briefs, Kilkenny v.
Greenberg Traurig.  In that case a motion to dismiss was
granted in that case where a paralegal alleged that the law
firm that he worked for as well as a client were joint
employers and there are various allegations just as there are
here, although the allegations in Kilkenny are actually more
compelling.  The paralegal's time was billed to the client, the

C4UFCONA

1    client paid funds to Greenberg based upon the number of hours

2    that the paralegal worked.  Assignments were conducted for that

3    client and in that case it was Morgan Stanley and yet a motion

4    to dismiss was granted in that case because there was no

5    evidence, no allegation that joint administration of that

6    employment relationship was going on.

7            Now, plaintiff has argued in its opposition that on a

8    motion to dismiss this issue cannot be, it can't be determined.

9            THE COURT:  What issue can't be determined?

10           MR. PEARSON:  Excuse me, joint employment or

11   employment relationship in general.  And plaintiff -- the

12   authority in the opposition is scant, but on this point,

13   plaintiff cites one case and a string of cases that were cited

14   in that opinion.  The case that was cited was Fowler.  As we

15   just saw with these two other cases that we've discussed, this

16   issue of employment can be decided as a matter of law.  In

17   Fowler, where a motion to dismiss was denied on the issue of

18   whether or not an employment relationship had been sufficiently

19   alleged, a completely different set of facts were at issue.

20   Fowler involved a case against a holding company and various

21   other affiliated companies.  The main defendant in that case

22   was Scores Holding Company.  The other defendants included

23   entities like scores West, various different companies with

24   which it had common management, common policies.  That's not at

25   all the case that we have here.

C4UFCONA

1              One of the cases that was cited by Fowler for the

2      proposition that motion to dismiss was an improper basis on

3      which to rule on an employment relationship, which was

4      Clinton's Ditch.   There the Second Circuit actually vacated an

5      NLRB finding of joint employment and actually stated that

6      limited supervision, allegations of limited supervision were

7      not enough to establish a joint employment relationship.   And

8      that's precisely because some amount of contact, some amount of

9      even direction, which I'm not saying is alleged here, is

10     perhaps inevitable when employees of different companies are

11     working in close quarters or occupying the same general space.

12     And any new allegations that plaintiff is going to try to

13     advance today, your Honor, has the plaintiff's letter of

14     March 30 and Saks' reply to that letter, are not relevant here.

15             The primary allegation advanced by plaintiff at the

16     previous court conference is not at all related to an

17     employment relationship of any kind.   It concerns only a

18     business relationship between Saks and one of its vendors and

19     has nothing to say regarding the administration of plaintiff's

20     employment, and at any arguments made to somehow lift or

21     bootstrap that allegation into something that might appear

22     relevant have no legal support whatsoever.

23             Now, the second primary argument for the motion to

24     dismiss here -- I do appreciate the Court's time -- is that

25     Saks is not alleged to have engaged in any unlawful activity.

C4UFCONA

1    It's not alleged to have discriminated against Conde and it's

2    not alleged to have retaliated against her.  Instead, the

3    plaintiff relies on a single paragraph in which he conclusorily

4    alleges that everything that supervisor Dugre did can somehow

5    be imputed to Saks.  Now, Dugre is a managerial employee, was

6    not a sales employee, was not a vendor support employee like

7    Conde, and yet there is nothing factual in the complaint to

8    support this new sweeping assertion that Dugre, too -- if it's

9    true for Conde, it's true for Dugre.  There's nothing to

10   support that whatsoever.  Totally different positions, totally

11   different places in the hierarchy at Sisley.

12           What's more, a joint employer assertion cannot alone

13   support an imputation of liability.  The Lima v. Yadeko case in

14   the briefs stands for that proposition.  In that case, the

15   defendant entity had no knowledge of the alleged protected

16   activity, of the discrimination, and therefore couldn't be held

17   liable.  Even where a joint employer relationship was found

18   which here we allege there's no basis for whatever, even taking

19   the complaint as true.

20           Now, we've already talked about the allegations in

21   which plaintiff repeatedly says that it was Sisley that was

22   discriminating, the discrimination was reported to Sisley.

23   There's no knowledge alleged by Saks here and no action alleged

24   by Saks here.  Now, the retaliation component also fails,

25   because if you're not aware of the discrimination, you can't

C4UFCONA

1    retaliate based on the discrimination or based upon the

2    protected activity if you're not aware of that.

3            Now, plaintiff will likely point to that August 22

4    allegation and say, well, in that meeting a complaint about the

5    other employee and how she treated Arab customers was made to

6    Dugre.  We've already talked about the fact there's no factual

7    support for Dugre's actions being imputed to Saks.  What's

8    more, there's no allegation that that complaint was discussed

9    in that meeting.  So the complaint again fails to allege any

10   knowledge by Saks here.

11           On the point of constructive discharge, plaintiff

12   doesn't dispute that she resigned her employment and in order

13   to establish constructive discharge she needs to allege

14   deliberate action that made her work environment so

15   intolerable, her working conditions so intolerable that a

16   reasonable person couldn't withstand them, would be compelled

17   to resign.  A reasonable person.  That is a very, very high

18   standard.  Plaintiff doesn't come close to meeting that even on

19   the terms of her own allegations.  The constructive discharge,

20   your Honor, is alleged to be her proposed transfer to

21   Bloomingdale's and her being put on final warning.  Not being

22   told if you don't quit you're going to be terminated, but being

23   put on a final warning and being told you're going to be

24   working at Bloomingdale's, which is about a mile from Saks.

25   Plaintiff might feel that Bloomingdale's is Siberia, but no

C4UFCONA

1    reasonable person would.

2          For similar reasons, plaintiff's allegations of aider

3    and abettor liability also fail.  If Saks can't be held liable

4    for aiding and abetting, then the New York City Human Rights

5    Law claims have to be dismissed because an aider and abettor

6    has to be engaged in purposeful action and share a commonness

7    of purpose with the primary wrongdoers.

8          Now, in terms of the filing requirements, they're

9    especially clear and plaintiff didn't advance substantive

10   arguments to counter them.  Saks was not named as a respondent

11   in her EEOC charge, and we're far from 300 days on that and the

12   complaint was not served on either the Commission of Human

13   Rights or on the Office of Corporation Counsel and therefore

14   the New York City Human Rights Law claims also didn't satisfy

15   the filing requirements.

16         THE COURT:  Plaintiffs on this point suggest that the

17   right to sue letter, that the time period in which to file has

18   not run, right?  Right, Mr. Rose?  That's a correct

19   characterization of at least one of your arguments?

20         MR. ROSE:  At the time that the brief was written,

21   yes.  But since that we've come to find out that we would not

22   be able to receive --

23         THE COURT:  You could not do it now?

24         MR. ROSE:  Not for Title VII.

25         THE COURT:  Some kind of tolling -- no, you're not

C4UFCONA

1    arguing that?

2          MR. ROSE:  Not that I'm aware of.

3          THE COURT:  I just wanted to be sure I wasn't missing

4    something.  All right, go ahead, Mr. Pearson.

5          MR. PEARSON:  And therefore, your Honor, we submit

6    here that the complaint falls absolutely short of alleging

7    anything other than a vendor relationship.  There's just no

8    factual basis here, taking the complaint as true, for

9    establishing any employer relationship between Conde and Saks.

10          THE COURT:  All right, and you're also arguing that

11    the proposed amendments would be futile.

12          MR. PEARSON:  That's correct, your Honor.  Yes, they'd

13    be futile and they wouldn't change the analysis here at all.

14          THE COURT:  Okay.  Can we do this?  I just got an

15    e-mail indicating that one of my colleagues has asked me to

16    give her a call.  I'm just going to jump off to do that as a

17    courtesy.  I don't know if it's an emergency or not, I'm just

18    going to take two minutes, maybe five tops to do that.  Thank

19    you for your indulgence.  It could be an emergency and I don't

20    want to leave her waiting.

21          MR. PEARSON:  Of course.

22          THE COURT:  I'll be right back.

23          (Recess)

24          THE COURT:  Sorry about that.  Have a seat.  All

25    right, Mr. Rose, we'll hear from you, then, I guess responding

C4UFCONA

```
 1    to some of those points.

 2            MR. ROSE:  Sure, your Honor.  Defendants make the

 3    three arguments that they essentially make in their motion.

 4    First is that they can't be considered an employer, the second

 5    is that they didn't do anything wrong and the third is an

 6    administrative filing requirement.

 7            Whether they're an employer, they do have several

 8    instances that they describe where if one of the factors that

 9    we have alleged in the case that certainly that may not reach

10    the standard, but it's the cumulative effect of everything that

11    Saks exercises over Sisley employees that creates the

12    employment relationship.  That's why the standard is a list of

13    factors to be considered and not a checklist which if only one

14    or two of them exist then you can disregard it.  For example,

15    every morning when a Sisley employee comes to the Saks store

16    they have a meeting that's conducted by Saks employees.

17    They're told policies, procedures that they must follow while

18    they're working within the Saks location.  It's the same for

19    all of the vendors.

20            THE COURT:  So in your view that makes everybody who

21    works for a vendor a Saks employee because they had that

22    meeting?

23            MR. ROSE:  Not necessarily because of that meeting,

24    but that meeting is certainly a factor to be considered.  In

25    addition to that there are handbooks that are handed out
```

C4UFCONA

1    created by Saks, enforced by Saks employees, security guards

2    are informed that they can enforce Saks employees against

3    Sisley employees, against other vendors.

4            THE COURT:  We have employees in this building, they

5    have to abide by the conditions of the building, but that

6    doesn't make them federal employees, right?

7            MR. ROSE:  Not necessarily, but if they're required to

8    dress the way that the federal government tells them to dress

9    and throughout the day they're overseen by federal employees,

10   they're told what to do by federal employees, they could be

11   told they're not allowed to work there by federal employees and

12   I think that would make them at least for purposes of Title VII

13   or the State Human Rights Law or the City Human Rights Law it

14   would subject the federal government to liability.

15           The question here is not there's this broad definition

16   of employment, the question is whether for the purpose of these

17   statutes which are remedial in nature, whether Saks can be

18   considered an employer and be held liable for their actions.

19           One of the allegations which was brought to light

20   during the depositions, for example, all of the Sisley

21   employees who began work in September of 2007 when Ms. Conde

22   began working there had been Saks employees.  They testified

23   that nothing substantively changed when the policy was switched

24   so that Saks employees now became vendor employees.  There had

25   previously been a manager from an outside vendor, a Sisley

C4UFCONA

 1    employee who came in and supervised Saks employees.  They just

 2    switched titles, the name on the check changed and that was

 3    substantively it.  They still had to clock in and out of Saks

 4    computers, they were selling Saks merchandise, because Saks

 5    actually purchased the merchandise from Sisley, put it into

 6    their store and then had Sisley employees sell it.

 7         This operation is anything but typical of a vendor

 8    relationship.  There's complete integration of management,

 9    there's complete integration of policies.

10         THE COURT:  Integration of management?

11         MR. ROSE:  Yes.  Bhagvan Dugre was the management for

12    Sisley.  In addition to that, there were several other managers

13    for Saks who regularly discussed what they were going to do

14    with Bhagvan Dugre.  These are things --

15         THE COURT:  All right, integration of management, it

16    typically would mean something different in a joint employer

17    situation.  What you're saying is that Dugre sort of had

18    interaction with Saks people as well as with her own company,

19    but you're not suggesting that the senior managers at Saks are

20    also senior managers of Sisley?

21         MR. ROSE:  No, I'm not suggesting that at all.  What

22    I'm suggesting is that when they operate together to enforce

23    the same group of policies and when those policies are Saks

24    policies, then they should be considered an employer at least

25    for these causes of action.  To say that an employer could, in

C4UFCONA

 1   Saks' position bring in vendors, have someone else put their

 2   name on the check, control all other aspects of their

 3   employment, then for --

 4            THE COURT:  What does all other aspects of their

 5   employment mean?  The rate of pay?

 6            MR. ROSE:  Well, not the rate of pay, but certainly

 7   whether they're able to work there.

 8            THE COURT:  Well, vacation schedules, things like

 9   that?  That's not in the complaint, but if the plaintiff wanted

10   to take a personal day or a vacation day, she'd have to get

11   that cleared by Saks?

12            MR. ROSE:  No, that would go through a Sisley

13   employee.  Okay so not all of the aspects of the employment,

14   but at least the rules, the way they dress, the way they

15   operate.

16            THE COURT:  What does that mean the way they operate?

17            MR. ROSE:  They were given handbooks that told them

18   exactly what they could and could not do while in the Saks

19   locations that was enforced by Saks employees who regularly

20   supervised them.  They had access to Saks' human resource

21   employees.

22            The issue here is not necessarily whether for the

23   purposes of other laws they can be considered employer.  The

24   issue here is whether these laws specifically were meant to

25   allow some type of liability if they decided to do something

C4UFCONA

1    that was discriminatory or retaliatory in nature under the law.
2    And that should be read broader than if they were, say, a Fair
3    Labor Standards Act case.
4            THE COURT:  Certain employment cases are borrowing
5    from the Fair Labor Standards Act standard to determine joint
6    employment.  You agree with that?
7            MR. ROSE:  In some aspects, yes, but I think it should
8    be read more broadly because we're not asking them to pay them
9    any type of compensation.  We're asking them if they're going
10   to take an action against Ms. Conde that it not be
11   discriminatory in nature.
12           THE COURT:  Well, all right, in that case I missed the
13   next point that Mr. Pearson argued, which is that there's
14   nothing alleged in the complaint to indicate that anybody at
15   Saks was even aware of much less participated in the decisions
16   to move or transfer the plaintiff to another store.
17           MR. ROSE:  Well, there are three issues really that
18   they brought up.  The first is whether the actions of Bhagvan
19   Dugre should be reported to Saks.  I think that the argument
20   there, at least on our end is very weak because Ms. Conde or
21   Ms. Dugre was not a Sisley employee, she was management for
22   Sisley and so her actions necessarily can't be purported to
23   someone who didn't employ her directly and have knowledge of
24   her.  But what they did have knowledge of is that Ms. Conde
25   made a complaint to them about the way that Arab customers were

C4UFCONA

```
1    treated in the workplace, about something Ms. Michaels was

2    doing when she specifically targeted Arab customers.  After she

3    made that complaint which defendant Saks did have knowledge of,

4    she was then soon after transferred or told that she was no

5    longer allowed to work there.

6           So that would give them knowledge of the complaint and

7    then an action taken within a brief period of time afterwards

8    telling Ms. Conde that she could no longer work in their store.

9    Well, that may not amount to constructive termination

10   necessarily, it certainly is an adverse employment action and

11   something that any employer could be held liable for.

12          THE COURT:  Are there other points you wanted to get

13   to?

14          MR. ROSE:  The last point I have is under the New York

15   City Human Rights Law there's no argument in the motions

16   relating to the New York City Human Rights Law filing

17   requirements and there is no requirement that Ms. Conde had

18   filed some type of notice for the City before she brings a

19   claim under that law, so the Title VII argument should stand.

20          THE COURT:  All right.  Is there something you want to

21   say in response?

22          MR. PEARSON:  Yes, your Honor.  Taking the last point

23   first, if the Court turns its attention to footnote 5 on page

24   23 of Saks' original memorandum of law, he will find the

25   argument that was made regarding the New York City Human Rights
```

C4UFCONA

1   Law, the filing requirement for that statute.  So that's first.

2   And I'll make another just quick couple of other points.

3          Taken individually or taken concerning the totality of

4   the circumstances our argument stands that there's no

5   allegation of anything beyond typical vendor contact with other

6   employees here.  No detail has been provided by plaintiff

7   regarding the contents of the handbook beyond the sort of

8   typical code of conduct and that sort of thing that would be

9   required of many vendor employees working at someone else's

10  facility.  The store has to be able to avoid disturbances, has

11  to have some control over disruption or other eventualities

12  that its vendors' employees may cause.  That's not at all

13  something that would be out of the ordinary that they could

14  actually go to one of their business partners and say we'd

15  rather not work with so-and-so, we'd rather they be replaced or

16  that we work with some other person.

17         As far as the merchandise, again, that goes purely to

18  a business relationship.  No allegation, no support has been

19  offered for how that in any way affects the employment

20  relationship here or adds any allegations regarding employment.

21  And as far as the civil rights law and providing some kind of

22  remedy for third parties who might aid or abet a discriminatory

23  or employer who is retaliating against employees, that is

24  precisely what the aiding and abetting cause of action under

25  that law is supposed to accomplish.  So there is a remedy for

C4UFCONA

1    such situations.  And that cause of action which is alleged in

2    the complaint fails as well for the reasons that we earlier

3    discussed.

4              Finally, there's no allegation that Saks had knowledge

5    of the complaint.  That doesn't appear in the complaint.

6              THE COURT:  I just want to make sure, Mr. Rose, that I

7    understand what you're referring to.  You said they had

8    knowledge.  That's not in the complaint, right?

9              MR. ROSE:  Paragraph 59, it does allege that they had

10   knowledge of her complaint.

11             THE COURT:  Well, I mean that's just an assertion.

12   There's no fact that's being alleged to suggest -- you don't

13   say that somebody told a Saks employee this.  You just assert

14   in a pretty bare bones fashion that defendants constructively

15   terminated plaintiff because of her race and because she

16   complained of race based-consideration, defendants lumping them

17   all together.  Is there some factual allegation that Saks or

18   Saks employees was aware of the complaint?

19             MR. ROSE:  Not specifically, but we do have that

20   information as part of the evidence and we can assert it if

21   your Honor deems that not to be sufficient.  But this is right

22   after there was a meeting held jointly with a manager for

23   Sisley and two employees of Saks.

24             THE COURT:  Right, but just saying that Ms.  --

25   according to paragraph 46, what happened at that meeting was

C4UFCONA

1    that your client was accused of insulting customers, told to go

2    home and wait for someone to call her, and then she was told

3    that she was no longer permitted to work in the store, right?

4                MR. ROSE:  Yes.

5                THE COURT:  I don't know there's any facts being

6    alleged to suggest that actually the Saks employees were aware

7    of the complaint.

8                MR. ROSE:  If necessary, we can provide additional

9    allegations.

10               THE COURT:  Well, what are they?  What are the

11   allegations?

12               MR. ROSE:  A human resources employees for Saks had

13   specific knowledge of the complaint that Ms. Conde made about

14   Ms. Michaels' actions, that she heard them directly.

15               THE COURT:  Before the adverse action?

16               MR. ROSE:  Yes.

17               THE COURT:  And this came out in depositions or

18   something?

19               MR. ROSE:  Yes, your Honor.

20               THE COURT:  You agree with that characterization,

21   Mr. Pearson?

22               MR. PEARSON:  I'm not sure I do, your Honor.  I did

23   attend the depositions as an observer and I'm not completely

24   calling into question plaintiff's characterization, but I can

25   say that based upon my own review and digest of the depositions

C4UFCONA

```
 1   I don't recall that being testified to.
 2             THE COURT:  All right.  This is not one of the seven
 3   new facts alleged in your letter, I don't think, is it,
 4   Mr. Rose?
 5             MR. ROSE:  No, it's not, your Honor.
 6             THE COURT:  No.  Okay.
 7             MR. PEARSON:  Your Honor, plaintiff did attend that
 8   meeting, and plaintiff would have made any other complaints to
 9   Saks or Sisley personnel and --
10             THE COURT:  Did attend what meeting?
11             MR. PEARSON:  Did attend the August 26 meeting.
12             THE COURT:  The one where she was terminated?
13             MR. PEARSON:  The August 26.  The one where she
14   alleges she was terminated and told you have to go home for
15   today.
16             THE COURT:  Right.
17             MR. PEARSON:  So to the extent that there was any
18   evidence of further discussion it easily could have been
19   included in the two versions of the complaint we've seen so far
20   as well as it could have been inserted in some fashion in
21   connection with the opposition as well.  It just has not been.
22             THE COURT:  Okay.
23             MR. PEARSON:  Thank you.
24             THE COURT:  All right.  Mr. Rose, anything else you
25   wanted to add that we didn't get to?
```

C4UFCONA

1          MR. ROSE:  No, your Honor.

2          THE COURT:  Okay.  All right.  Well, I have thought

3     over this long and hard and looked at the complaint and the

4     additional allegations that are set forth in the plaintiff's

5     letter and I'm prepared to dismiss the complaint against Saks.

6     I'll issue a written opinion and order to make clear the

7     reasons why, but I think it's largely for the reasons stated by

8     Mr. Pearson, and I don't think that the facts alleged in the

9     letter would make a difference, so I think a proposed amended

10    complaint would be futile at this point.  So I'm prepared to

11    deny that motion as well.

12          Now, tell me where we are with discovery with the

13    remaining defendant.

14          MR. METIS:  Yes, your Honor.  We still have some

15    outstanding discovery.

16          THE COURT:  Well, I expect that we did.  So what do we

17    need to do?

18          MR. METIS:  I think we need to do two things.  One is

19    wrap up the discovery between Sisley and plaintiff.

20          THE COURT:  And what will that consist of?

21          MR. METIS:  I think it's a couple of more depositions

22    that we're looking at.

23          THE COURT:  Of whom?

24          MR. METIS:  One that plaintiff has requested that it

25    could be a former employee of ours that we have, we're

C4UFCONA

searching for her actually to get some information, and then
just now that Saks is no longer part of the case, there's going
to be some third party discovery that needs to be done.

          THE COURT:  What does that consist of?

          MR. METIS:  I think just a few depositions.  Maybe one
on our part.  I don't know what the plaintiff wants and some
document discovery against Saks, some handbooks and some
documents that came up during the depositions.  So I don't
think it's extensive, but that's what we have.

          THE COURT:  All right, so how much time?  I'm just
trying to remind myself as to when this was supposed to wrap
up.

          MR. METIS:  I guess by the end of June.

          MR. PEARSON:  The parties had previously discussed
three months.

          MR. METIS:  Two or three months in the time frame to
wrap up discovery.

          THE COURT:  All right.  Mr. Rose, what are your
thoughts in terms of additional discovery at this point?

          MR. ROSE:  That sounds about right, a couple of months
would be fine.  I think we have some outstanding written
discovery and a couple of depositions and the third party
discovery.

          THE COURT:  I wonder if it makes sense for you folks
to get together and submit a revised case management plan that

C4UFCONA

```
 1   sets up actual dates for this to wrap up.  What sort of expert

 2   discovery, if any, are we contemplating?

 3            MR. METIS:  We're not contemplating any at this point,

 4   your Honor.

 5            THE COURT:  How about Mr. Rose?

 6            MR. ROSE:  We will submit an expert report relating to

 7   emotional damages.

 8            THE COURT:  That's what I figured, if there were going

 9   to be any.  So you'll confer and I think why don't you submit a

10   revised case management plan, but ballpark is three months from

11   today we'll be done with all discovery?

12            MR. ROSE:  Yes, your Honor.

13            THE COURT:  All right.  End of July, right?  And of

14   course that puts us right into August where I think the odds of

15   getting us all available on the same date or the same week are

16   going to be slim to none.  Are some of you planning to go away

17   in August?

18            MR. METIS:  I actually am overseas the last week of

19   July and the first week of August.

20            MR. ROSE:  I'll be out all of August.

21            THE COURT:  Lucky you.

22            MR. ROSE:  My wife is due July 31.

23            THE COURT:  Maybe we should schedule a conference the

24   first ten days of September?  Let's see what works.  So if we

25   wrap up all discovery, boom, by July 31, then if I can get
```

C4UFCONA

1    premotion letters if there's going to be a motion for summary

2    judgment, there often are in these cases, so I'd like to get

3    those by the end of discovery, so the end of July, and then

4    we'll have a conference, a premotion conference or just a

5    pretrial conference if there are no motions contemplated,

6    September 7, that's the Friday after Labor Day.  Is that all

7    right?  Everyone is going to be back and primed by then?

8              MR. METIS:  Yes, your Honor.

9              THE COURT:  Let's say 9:30.  Is morning all right?

10   It's not a problem?  Some people have child care issues or

11   commuting issues.

12             MR. METIS:  If we could make it 10:00.

13             THE COURT:  How about 11?

14             MR. METIS:  That's fine.

15             THE COURT:  11:00, okay?  All right, and I'll put that

16   in the revised case management plan, but I'm first going to

17   wait to get that proposed plan from you folks and I'll tweak

18   it.  If you can get me that by Friday, do you think you can get

19   me a revised case management plan, you'll confer and come up

20   with the new dates?  Send it to me electronically just by

21   e-mail to my chambers e-mail by Friday?

22             MR. METIS:  Yes, your Honor.

23             THE COURT:  And I'll issue the order probably within

24   the next week or so just explaining my reasons, but I don't

25   think there's any point in waiting, so you can go back to your

C4UFCONA

1    colleagues, talk to them and send them a copy when I issue the

2    order.

3              Anything else we need to discuss today?  All right.

4    If you need a copy of the transcript take it up with the court

5    reporter and see what you send me on Friday and then I'll issue

6    orders after that.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25